GEORGE O. TOMLIN, APPELLANT, *v.* JACQUES MOR-VAY, DOING BUSINESS AS MORVAY'S BUILDING SUP-PLY AND JOHN DOE, RESPONDENT.

No. 3725

May 19, 1953.                    256 P.2d 1096.

*Ernest S. Brown,* of Reno, for Appellant.

*Griswold, Vargas and Bartlett,* of Reno, for Respondent.

## OPINION

By the Court, EATHER, C.J.:

This is an action for damages for personal injuries resulting from negligence. Judgment of the trial court, acting without a jury, was for defendant, and plaintiff has taken this appeal upon the sole ground that the evidence does not justify the decision and judgment.

The accident involved occurred during the delivery of a 550-gallon metal oil tank to plaintiff's residence by defendant's delivery truck. The injury to plaintiff resulted from his being struck on the head as the tank was ejected from the truck by the driver of the truck, defendant's employee. Plaintiff and the driver were the only witnesses to the events leading up to the accident. Each in many respects contradicted the testimony of the other.

Plaintiff concedes that in the light of the ground for this appeal, the testimony of the driver must be accepted by this court; that the sole question involved is whether that testimony itself discloses negligence on the part of the driver. The driver of the truck, George James Stiller, called as a witness on behalf of the defendant, testified in part as follows:

"Q. Now, did you have occasion, Mr. Stiller, on or

about the 1st of April, 1950, to drive an oil truck out to Mr. George Tomlin's residence? A. Yes.

"Q. What kind of a truck were you driving on that occasion? A. 1942 Dodge pick-up, half-ton.

"Q. That was just a standard half-ton pick-up? A. Yes.

"Q. And did you take a tank out there on that truck? A. Yes, sir.

"Q. Where did you get the tank? A. Acme Supply.

"Q. At about what time of day did you drive it out there? A. It was late in the afternoon, approximately 4:30, 5 o'clock.

"Q. And will you please describe to the Court how that tank was on the truck?

A. The tailgate was out flat, level with the bed of the truck, and the tank just fitting in the bed, approximately a foot and a half from the cab back, and I imagine it was 14 inches overhang, over the end of the tailgate.

"Q. In other words, there was a space between the forward end of the tank and the back of the cab? A. Yes.

"Q. And the tailgate was down? A. Even with the level of the bed.

"Q. And there was some overhang over the tailgate? A. Yes, sir.

"Q. And the bottom of that tank rests right down in on the bed of the truck? A. Yes.

"Q. What kind of sides did the truck body have on it? A. Oh, approximately 18 inches high and a four inch slope on top, ordinary pick-up bed.

"Q. That is, the top part of the sidewalls extend outward? A. About 4 inches of it, yes.

"Q. Now, will you please describe to the Court in your own language, Mr. Stiller, just exactly what happened from the moment you arrived out at the premises of Mr. Tomlin until you left? A. Well, when I got there he came out and asked me if I could put the tank around behind the building. I turned around, backed in the driveway, clear to the back of the house, and he

has dug a sewer line along—12, 14 feet—behind the house and I had to back between the house and the sewer line. And as I did that, it was muddy and slick, and the back end slid over. One hind wheel went in the ditch, the soft dirt. I couldn't go forward or backward. We decided to unload the tank there.

"It was about 14 feet or so from where he wanted it to be unloaded. I got in to push the tank out. I usually get in between the tank and the cab, put my shoulder against it, and push it out. When it lands it is supposed to land on the end of the tank. And I pushed on the tank, and it didn't go out very easy.

"He said he was going to help me. I says it wasn't necessary. I could push it myself, not to get behind it; so the tank would tip up on one end.

"I turned around to push the tank. When I pushed it went out very easily. He said it hit him on the head. It didn't knock him down or anything and he didn't appear to me to be hurt bad. We turned the tank around, put it up on some blocks there.   *   *   *

"Q. Now, when you started first to unload the truck you were in the space between the front end of the tank and the rear of the cab? A. Yes, sir.

"Q. Where was he standing at that time when he asked you if he could help you? A. Beside the pick-up, approximately the center.

"Q. Did you at any time ask him to help you? A. No, sir.

"Q. The only thing that was said about helping you was when he asked you if he could help you, is that right? A. Yes.

"Q. You told him it wasn't necessary? A. I told him not to get behind the tank.

"Q. You told him not to get behind the tank? A. Yes, sir.

"Q. Because when it came out it would— A. Tip up on end.

"Q. —tip up on end, and then you went about pushing it again? A. Yes.

"Q. Did you actually see it strike him, Mr. Stiller? A. Oh, no, I—no.

"Q. The last you saw of him before he was struck was when he was standing by the side of the fender, as you have said? A. Yes. * * *

"Q. Have you had occasion to unload tanks like this one prior? A. Yes.

"Q. How did you do that? A. The same way I did this one. Get between the cab and the truck [tank] and push it out with my shoulder."

It is apparent from the testimony that the driver sought no assistance from plaintiff and warned plaintiff not to get behind the truck. The bed of the truck was four feet wide and eight feet long. The tailgate was down and the tank, some ten feet long, projected beyond the tailgate. The process of unloading consisted in simply pushing the tank off the end of the truck till its weight tipped the end to the ground. This was the customary method of unloading. As the tank fitted snugly into the bed and sides of the truck, the driver's first attempt to dislodge it failed. He then placed himself in a more favorable position between the forward end of the tank and the back of the cab and was able to push the tank out of the truck. His last view of plaintiff, but a few moments before, found the plaintiff in the clear, to one side of the truck, towards the rear end.

Plaintiff contends that the testimony of the driver discloses negligence on the part of the defendant or his driver in two respects. First: That since the testimony on cross examination was to the effect that it took two men to load the tank onto the truck, defendant was negligent in not supplying two men for the delivery of the tank. We cannot regard this as negligence. Plaintiff has not suggested what function the second man would perform other than to keep bystanders out of the way. The driver's warning should have been sufficient to have served this purpose. Second: That while the

driver had checked the position of plaintiff before making his first attempt to eject the tank, he did not again check that position before making his second and successful attempt. This we cannot regard as negligence. The warning having been given, it was entirely reasonable for the driver to suppose that it would be respected and that the position of plaintiff would remain unchanged.

Upon the testimony of the driver one can only conclude that the plaintiff deliberately disregarded the given warning and voluntarily placed himself in a position of known danger contrary to the wishes and advice of the driver. We find no negligence on the part of defendant or his driver upon this state of facts.

Judgment affirmed with costs.

MERRILL and BADT, JJ., concur.